# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE MULTIPLAN CORP.<br>STOCKHOLDERS LITIGATION | )<br>)<br>)<br>) | CONSOLIDATED<br>C.A. No. 2021-0300-LWW |

# OPINION

Date Submitted: September 20, 2021
Date Decided: January 3, 2022

Gregory V. Varallo, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, Wilmington, Delaware; Mark Lebovitch, Daniel E. Meyer, Margaret Sanborn-Lowing, and Joseph W. Caputo, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York; *Counsel for Plaintiffs Kwame Amo and Anthony Franchi*

Raymond J. DiCamillo, Kevin M. Gallagher, and Matthew D. Perri, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Jonathan K. Youngwood and Rachel S. Sparks Bradley, SIMPSON THACHER & BARTLETT LLP, New York, New York; Stephen P. Blake, SIMPSON THACHER & BARTLETT LLP, Palo Alto, California; *Counsel for Defendant MultiPlan Corporation f/k/a Churchill Capital Corp. III*

Bradley R. Aronstam and S. Michael Sirkin, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; John A. Neuwirth, Joshua S. Amsel, Evert J. Christensen, Jr., Matthew S. Connors, and Nicole E. Prunetti, WEIL, GOTSHAL & MANGES LLP, New York, New York; *Counsel for Defendants Michael Klein, Jay Taragin, Jeremy Paul Abson, Glenn R. August, Mark Klein, Malcolm S. McDermid, Karen G. Mills, Michael Eck, M. Klein and Company, LLC, Churchill Sponsor III, LLC, and The Klein Group, LLC*

**WILL, Vice Chancellor**

Churchill Capital Corp. III—a special purpose acquisition company, or SPAC—was formed as a Delaware corporation in October 2019. Lacking operations of its own, the SPAC's primary purpose was to seek out and combine with a private operating company. The SPAC closed its $1.1 billion initial public offering in February 2020.

The SPAC's sponsor, led by Michael Klein, was compensated for its anticipated efforts in the form of "founder" shares constituting 20% of the SPAC's equity and purchased for a nominal price. The SPAC's directors were hand-picked by Klein and given valuable economic interests in the sponsor.

The SPAC's initial public stockholders, on the other hand, purchased IPO units consisting of one common share and a fractional warrant for $10 per unit. The IPO proceeds were placed into a trust account. The SPAC was structured around giving public stockholders the choice between redeeming their $10 investment from the trust and investing in the post-combination entity after an acquisition target was identified.

If the SPAC entered into a business combination within its two-year completion window, the founder shares would convert into common shares upon closing. But if no transaction was completed, the SPAC would liquidate—leaving the founder shares worthless. Public stockholders, on the other hand, would receive back the full value of their investment with interest.

1

The SPAC's sponsor team selected MultiPlan, Inc. as its target. The SPAC issued a proxy statement that solicited stockholder votes on the deal and informed public stockholders' redemption decisions. Few stockholders redeemed and the stockholder vote on the merger was overwhelmingly in favor. The business combination closed in October 2020 and the SPAC's non-redeeming stockholders became stockholders in the combined entity. After closing, these shares declined in value to several dollars below the $10 plus interest the public stockholders could have received had they chosen to redeem. By contrast, the founder shares, which converted into shares of the post-merger entity, were pure upside to the SPAC's insiders.

The plaintiffs allege that the SPAC's fiduciaries—motivated by financial incentives not shared with public stockholders—impaired the public stockholders' right to divest their shares before the business combination occurred. According to the Complaint, material information indicating that MultiPlan's largest customer was building an in-house platform to compete with MultiPlan was withheld. The defendants have moved to dismiss the plaintiffs' claims on several grounds— primarily, that the plaintiffs have alleged derivative claims but failed to plead demand futility and that the business judgment rule applies.

Many of the parties' arguments center around the unique characteristics of a SPAC. Though SPACs are a popular vehicle for private companies to access the

2

public markets, Delaware courts have not previously had an opportunity to consider the application of our law in the SPAC context. In this decision, well-worn fiduciary principles are applied to the plaintiffs' claims despite the novel issues presented. Doing so leads to several conclusions.

The plaintiffs have pleaded direct claims that center around the purported impairment of their redemption rights. The entire fairness standard of review applies due to inherent conflicts between the SPAC's fiduciaries and public stockholders in the context of a value-decreasing transaction. And the plaintiffs have pleaded viable, non-exculpated claims against the SPAC's controlling stockholder and directors.

It bears emphasizing that my conclusions stem from the fact that a reasonably conceivable impairment of public stockholders' redemption rights—in the form of materially misleading disclosures—has been pleaded in this case. Many of the features that I consider in this opinion are common to SPACs, although some entities have more bespoke structures intended to address conflicts. The mismatched incentives relevant here were known to public stockholders who chose to invest in the SPAC. But those stockholders were allegedly robbed of their right to make a fully informed decision about whether to redeem their shares. Accordingly, and for the reasons discussed below, the defendants' motions to dismiss are denied except as to two named defendants.

# I.   BACKGROUND

The following facts are drawn from the Verified Class Action Complaint for Breach of Fiduciary Duties (the "Complaint") and the documents it incorporates by reference.[1]  Any additional facts discussed in this Opinion are subject to judicial notice.[2]

## A.   Churchill's Formation

Defendant Churchill Capital Corp. III ("Churchill" or the "Company") was formed in October 2019 to serve as a special purpose acquisition company.[3]  A SPAC—also called a blank check company—is a publicly traded company that raises capital through an initial public offering to realize a single goal: merge with a

---

[1] Verified Class Action Compl. for Breach of Fiduciary Duties ("Compl.") (Dkt. 1).  *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013) ("[A] plaintiff may not reference certain documents outside the complaint and at the same time prevent the court from considering those documents' actual terms." (quoting *Fletcher Int'l, Ltd. v. ION Geophysical Corp.*, 2011 WL 1167088, at *3 n.17 (Del. Ch. Mar. 29, 2011))); *Freedman v. Adams*, 2012 WL 1345638, at *5 (Del. Ch. Mar. 30, 2012) ("When a plaintiff expressly refers to and heavily relies upon documents in her complaint, these documents are considered to be incorporated by reference into the complaint . . . ."), *aff'd*, 58 A.3d 414 (Del. 2013).

[2] *See, e.g.*, *In re Books–A–Million, Inc. S'holders Litig.*, 2016 WL 5874974, at *1, *8 (Del. Ch. Oct. 10, 2016) (explaining that the court may take judicial notice of "facts that are not subject to reasonable dispute"); *Omnicare, Inc. v. NCS Healthcare, Inc.*, 809 A.2d 1163, 1167 n.3 (Del. Ch. 2002) ("The court may take judicial notice of facts publicly available in filings with the SEC."); *McMillan v. Intercargo Corp.*, 768 A.2d 492, 501 n.40 (Del. Ch. 2000) ("The court may take judicial notice of a[] . . . charter provision in resolving a motion addressed to the pleadings.").

[3] Compl. ¶ 20.  Churchill was later renamed MultiPlan Corporation and is listed as a defendant under that name.  *See infra* note 43 and accompanying text.

private company and take it public.[4]  Unlike most companies that go public, a SPAC has no operations and its assets are effectively limited to its IPO proceeds.[5]

SPACs are often formed and controlled by an individual or management group, referred to as the SPAC's "sponsor."  The sponsor's primary job is to identify a target for a "de-SPAC" merger.  Churchill was no different.  Defendant Michael Klein, a former chairman of Citigroup's institutional clients group, incorporated Churchill as a Delaware corporation through defendant Churchill Sponsor III, LLC (the "Sponsor").[6]  The Sponsor's managing member is M. Klein Associates, Inc., whose sole stockholder is Klein.[7]

Churchill, Klein's third SPAC (of at least seven), was formed in the midst of a SPAC boom.[8]  In 2013, ten SPACs went public, raising a total of $1.4 billion.  By 2019, SPAC IPOs numbered 59, with $13.6 billion raised.  Those figures more than

---

[4] The transaction that this opinion refers to as a "merger" is technically a series of business combinations between SPAC merger subsidiaries and the target that result in the operating company becoming a subsidiary of the SPAC.

[5] For academic discussions of SPACs, including their features, mechanics, and historical trends, see Michael Klausner, Michael Ohlrogge, & Emily Ruan, *A Sober Look at SPACs* (European Corp. Governance Inst., Working Paper No. 746, 2021), http://ssrn.com/abstract_id=3720919, and Usha Rodrigues & Michael Stegemoller, *SPACs: Insider IPOs* (U. Ga. Sch. L., Research Paper 2021-09, 2021), https://papers.ssrn.com/sol3/pap-ers.cfm?abstract_id=3906196.

[6] Compl. ¶¶ 21, 54.

[7] *Id.* ¶ 30; Churchill Cap. Corp. III, Definitive Proxy Statement (Schedule 14A), at 248 (Sept. 18, 2020) ("Proxy").

[8] Compl. ¶ 53.

quadrupled and sextupled, respectively, in 2020, when 248 SPAC IPOs raised a total of $83.4 billion.[9]

### B. Churchill's IPO

Churchill went public in a $1.1 billion IPO on February 19, 2020.[10] Its prospectus explained that Churchill was a "newly incorporated blank check company formed as a Delaware corporation for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization or similar business combination with one or more businesses."[11]

Churchill sold 110,000,000 units at $10 per unit in its IPO.[12] Each unit consisted of one share of Churchill Class A common stock and a quarter of a warrant with an exercise price of $11.50.[13] Both the unit price and composition were market standard. Public investors who purchased units in the IPO could trade their shares and warrants separately on the New York Stock Exchange after a set time.[14]

Churchill's Class A shares composed 80% of Churchill's outstanding stock. Class B founder shares, purchased by the Sponsor for an upfront capital contribution

---

[9] *Id.* ¶ 40.

[10] *Id.* ¶ 56.

[11] Churchill Cap. Corp. III, Prospectus (Form 424B2), at 2 (Feb. 13, 2020) ("Prospectus").

[12] Compl. ¶ 56.

[13] *Id.*; Prospectus at 11.

[14] Prospectus at 10.

of $25,000, made up the remaining 20%.[15]   That 20% stake—a so-called "promote"—was the Sponsor's chosen form of compensation.  The founder shares would convert into Class A shares at a one-to-one ratio (subject to adjustments) if Churchill succeeded in consummating an initial business combination.[16]

The Sponsor was also compensated through an option to purchase warrants in the SPAC.  Churchill made a private placement of 23 million warrants to the Sponsor at $1 each (the "Private Placement Warrants").[17]  Like the warrants associated with the IPO units, the Private Placement Warrants had an exercise price of $11.50.[18]

Churchill's "completion window" for a business combination ended 24 months after the IPO—also market standard.[19]  If no transaction was completed by then, Churchill would return the IPO proceeds plus interest to its stockholders, cease operations, and wind up.[20]  In this scenario, both the Class B shares and Private Placement Warrants would expire worthless.[21]

---

[15] Compl. ¶ 56.

[16] Prospectus at 15-16.

[17] Compl. ¶ 56.

[18] Prospectus at 16.

[19] Compl. ¶¶ 43, 57. The completion window would extend to 27 months if Churchill "executed a letter of intent, agreement in principle or definitive agreement for an initial business combination within 24 months from the closing of this offering."  Prospectus at 1.

[20] Prospectus at 25.

[21] Compl. ¶ 57; *see* Prospectus at 14-16.

## C. Churchill's Directors and Officers

Klein, through his control of the Sponsor, had the exclusive power to appoint Churchill's board of directors (the "Board").[22] Klein initially appointed himself, along with defendants Jeremy Paul Abson, Glenn R. August, Mark Klein, Malcom S. McDermid, and Karen G. Mills, to the Board. He later added defendant Michael Eck and non-party Bonnie Jonas.[23] Klein served as Churchill's Chief Executive Officer and Chairman.[24] Defendant Jay Taragin served as Churchill's Chief Financial Officer.[25]

The Board members (other than Klein's brother Mark Klein) were compensated with membership interests in the Sponsor, indirectly receiving economic interests in the founder shares and Private Placement Warrants without diluting Klein's control of Churchill.[26] Abson, Eck, and Mills each held interests equivalent to 294,985 founder shares.[27] McDermid and August held interests worth

---

[22] Compl. ¶¶ 58-59.

[23] *Id.* ¶ 59.

[24] *Id.* ¶ 21.

[25] *Id.* ¶ 22.

[26] *Id.* ¶¶ 30, 58-60, 80.

[27] *Id.* ¶ 60; Proxy at 248. Abson held his interest in the Sponsor indirectly through TBG AG, an investment company. Proxy at 147, 248.

786,672 and 3,933,137 shares, respectively.[28] Klein's interest amounted to 20,710,281 founder shares.[29]

The directors and Taragin allegedly had prior connections to Klein. Taragin is the Chief Financial Officer of M. Klein & Company, LLC ("M. Klein & Co."), a global advisory firm whose managing partner is Klein.[30] Mark Klein and Eck are the managing member and a managing director of M. Klein & Co., respectively, and Mark Klein is its majority partner.[31] Abson, August, Mark Klein, McDermid, and Mills served on the board of Churchill Capital Corp. II, another SPAC founded by Klein. McDermid and Mills also served on the board of the original Churchill Capital Corp., and all but Abson have served on the boards of multiple other SPACs that Klein launched after Churchill.[32]

## D. The Trust

Following its IPO, Churchill began its search for an acquisition opportunity. The $1.1 billion raised in the IPO was held in a trust account throughout that process, as is typical for a SPAC. The funds in that trust account were unavailable to

---

[28] Compl. ¶ 60; Proxy at 248. McDermid held his interest in the Sponsor indirectly through Emerson Collective. Proxy at 148, 248.

[29] Compl. ¶ 60.

[30] *Id.* ¶¶ 22, 29.

[31] *Id.* ¶¶ 25, 28.

[32] *Id.* ¶ 60.

9

Churchill "[u]nless and until [Churchill] complete[d] [an] initial business combination."[33] Money could leave the trust account in one of three ways.

First, if Churchill failed to consummate a merger within the completion window, the company would liquidate and the funds in the trust would be returned. Each Class A stockholder would receive their pro rata share of the "aggregate amount then on deposit in the trust account, including interest."[34]

Second, if Churchill identified a target and proposed a business combination within the completion window, each Class A stockholder could choose to exercise a "redemption right." This redemption right is a unique feature of a SPAC. After a potential merger is disclosed but before the stockholder vote, Class A stockholders have an option to redeem their stock for the $10 IPO price plus any interest that accumulated in the trust.[35] Class A stockholders could redeem their shares regardless of whether they voted for or against the merger while retaining the warrants that were included in the IPO units at no cost. Churchill's certificate of incorporation established the redemption right: "[p]rior to the consummation of the

---

[33] Prospectus at 17; *see* Proxy at 4; Compl. ¶ 57.

[34] Prospectus 26. This 100% redemption of the public shares would be net of certain permitted withdrawals, such as capped fees to pay dissolution expenses and interest disbursements to pay tax liabilities. *Id.* References to "public stockholders" or "Class A stockholders" throughout the opinion those stockholders that had the opportunity to redeem their shares once Churchill proposed a merger.

[35] Compl. ¶ 44; *see* Proxy at 29.

initial Business Combination, [Churchill] shall provide all holders of Offering Shares with the opportunity to have their Offering Shares redeemed upon the consummation of the initial Business Combination."[36]

Finally, any funds left in the trust after stockholders were given the opportunity to redeem could be used "as consideration to complete [the] initial business combination" or "as working capital to finance the operations of the target business."[37]

### E.    The Board Selects MultiPlan

Churchill's search for an operating target company led it to Polaris Parent Corp. ("MultiPlan"), the parent company of MultiPlan, Inc.[38]  MultiPlan is a healthcare industry-focused data analytics and cost management solutions provider.[39]  Negotiations between Churchill and MultiPlan began in the spring of 2020.[40]

---

[36] Opening Br. in Supp. of Defs. Michael Klein, Jay Taragin, Jeremy Paul Abson, Glenn R. August, Mark Klein, Malcolm S. McDermid, Karen G. Mills, Michael Eck, M. Klein & Company, LLC, Churchill Sponsor III, LLC, and The Klein Group, LLC's Mot. to Dismiss ("Individual Defs.' & Klein Entities' Br.") (Dkt. 19), Ex. D § 9.2(a) ("Certificate of Incorporation").

[37] Prospectus at 73-74.

[38] *See* Proxy at 2, 87, 102.

[39] Compl. ¶ 8; Proxy at 4.

[40] Proxy at 102-07.

When a SPAC identifies its acquisition target, it typically commits its IPO proceeds along with additional capital raised in a private investment round known as a "PIPE" (private investment in public equity). On July 12, 2020, the Board unanimously approved an Agreement and Plan of Merger, contemplating a de-SPAC merger with MultiPlan.[41] The merger agreement called for the payment of aggregate consideration of cash and stock (valued at $10 per share) worth $5.678 billion to MultiPlan's stockholders.[42] Following a series of transactions, MultiPlan would become a wholly owned subsidiary of Churchill and Churchill would rename itself MultiPlan Corporation ("Public MultiPlan").[43]

The same day that the Board approved the merger, Churchill formally retained defendant The Klein Group LLC as a financial advisor with respect to the merger.[44] The Klein Group is a wholly owned subsidiary of defendant M. Klein & Co.[45] It received $30.5 million for its advisory services.[46]

---

[41] Compl. ¶ 63; Proxy at 107.

[42] Proxy at 4, 88. Technically, the stockholders that were compensated were those of Polaris Investment Holdings, L.P., which sat above MultiPlan. *See id.* at 4, 87-88.

[43] *See* Compl. ¶ 64; Proxy at 101.

[44] Compl. ¶ 63.

[45] *Id.* ¶ 31.

[46] *Id.* ¶ 63.

12

Also on July 12, 2020, Churchill, the Sponsor, and certain other parties entered into an Investor Rights Agreement.[47] Under the Investor Rights Agreement, the Sponsor's converted Class A shares would become subject to an 18-month lock-up period.[48] Additionally, the Sponsor, certain Board members, and Taragin entered into a Sponsor Agreement, under which about 45% of the Sponsor's converted Class A shares and roughly 21% of the Private Placement Warrants would "unvest" post-merger. These shares and warrants would revest if Public MultiPlan's stock price exceeded $12.50 for any 40 trading days in a 60-day period between one and five years after the merger.[49]

The de-SPAC merger and related financing transactions were announced on July 13, 2020.[50] The merger implied a Public MultiPlan enterprise value of $11 billion.[51] After closing and assuming no redemptions, the prior owners of MultiPlan would own 60.5% of the post-merger entity. Churchill's public Class A stockholders would own 16%. The Sponsor and its affiliates (including many of Churchill's

---

[47] Proxy at 2.

[48] *Id.* at 24. This lock-up period extended another that, as explained in Churchill's prospectus, kept the Sponsor from selling any founders shares until either a year had passed since the initial business combination or the common stock closed at no less than $12 per share for 20 days over a 30-day trading period. Prospectus at 15.

[49] Proxy at 24-25, 100, 238.

[50] Compl. ¶ 63; Proxy at 107.

[51] Proxy at 104, 115.

directors) would—after the Class B shares converted to Class A shares—own 4.2%.[52] The remaining 19.2% would be held by PIPE investors who together agreed to buy shares (and associated warrants) worth $1.3 billion, in addition to taking on $1.3 billion in convertible debt.[53] The PIPE investors included entities related to Klein, Abson, and August.[54] The PIPE financing, when combined with non-redemption agreements under which the Sponsor and certain insiders waived their redemption rights, ensured that Churchill could satisfy all closing conditions and the merger could be completed even if all public stockholders chose to redeem.[55]

Churchill set the record date for the special meeting to vote on the merger as September 14, 2020 and issued its definitive proxy statement (the "Proxy") on September 18, 2020.[56] The affirmative vote of a majority of Churchill's stockholders represented at the special meeting was required to approve the merger (assuming a valid quorum).[57]

---

[52] Compl. ¶ 65; Proxy at 27.

[53] Proxy at 27, 188.

[54] *Id.* at 117; *see* Compl. ¶ 49.

[55] Proxy at 5-6, 11-12, 26-27. This assumed that the PIPE investments would be "funded in accordance with their terms" and that signees to the non-redemption agreements would adhere to their terms. *Id.* at 12.

[56] Compl. ¶ 66.

[57] Proxy at 13, 128; *see supra* note 4.

The Proxy listed the "attractive valuation" and "opportunities for growth in revenues, adjusted EBITDA and free cash flow" as reasons that the Board was recommending the merger.[58] It also described the "extensive due diligence" conducted by the Board and Churchill management, including communications with "senior leaders of several large customers of MultiPlan."[59]

The Proxy disclosed that MultiPlan was dependent on a single customer—its largest—for 35% of its revenues.[60] It did not disclose that the customer was UnitedHealth Group Inc. ("UHC") or that UHC intended to create an in-house data analytics platform called Naviguard. Naviguard would allegedly both compete with MultiPlan and cause UHC "to move all of its key accounts from MultiPlan to Naviguard by the end of 2022."[61] UHC had publicly discussed its plan for Naviguard by June 2020.[62]

The Proxy was not accompanied by an independent third-party valuation or fairness opinion.[63] The financial analysis "primarily relied upon" by Churchill and

---

[58] Compl. ¶ 68.

[59] *Id.* ¶ 69.

[60] Proxy at 162.

[61] Compl. ¶¶ 12, 75.

[62] *Id.* ¶ 85.

[63] *Id.* ¶ 70; Proxy at 110.

15

included in the Proxy was prepared by Churchill management with assistance from The Klein Group.[64]

The Proxy explained that "a holder of public shares may demand that Churchill redeem such shares for cash if the business combination is consummated."[65] Class A stockholders had to both exercise their redemption right at least two days before the special meeting and cast a vote on the merger (either for or against) to receive back their share of the trust.[66] The Proxy stated that each share was valued at approximately $10.04 as of the record date.[67]

## F.    The Merger Closes

Churchill stock closed on the record date at $11.09 per share. The implied value of the Class B shares held by the Sponsor on that date—that is, their value once converted to Class A common stock—was roughly $305 million. At that price, Klein's interests were worth roughly $230 million. The remaining board members (other than Mark Klein) each held interests in founder shares worth at least $3

---

[64] Proxy at 113-15; *see* Compl. ¶ 71.

[65] Proxy at 29; *see id.* at 117.

[66] *Id.* at 29.

[67] *Id.*

million.[68]  Fewer than 10% of Churchill's public investors opted to exercise their redemption rights.[69]

On October 7, 2020, Churchill stockholders overwhelmingly voted to approve the business combination.[70]  Churchill completed the merger on October 8, 2020.[71]

On November 11, 2020, an equity research firm published a report about MultiPlan discussing, among other things, UHC's formation of Naviguard.[72]  Public MultiPlan's stock fell to a then-closing low of $6.27 the following day.[73]  Public MultiPlan stock also closed at $6.27 per share on April 8, 2021—the day before the Complaint was filed.[74]

### G.    This Litigation

Plaintiffs Kwame Amo and Anthony Franchi have held shares of Churchill (now Public MultiPlan) stock since before the record date for the de-SPAC merger.[75] Amo filed a putative class action complaint against the defendants on March 25,

---

[68] Compl. ¶ 67.  These figures do not account for the effect of the Investor Rights Agreement and Sponsor Agreement on the valuation.

[69] *Id.* ¶ 14.

[70] *Id.* ¶ 73.  Roughly 93% of the present shares voted in favor of the transaction.  MultiPlan Corp., Current Report (Form 8-K), at 27 (Oct. 8, 2020).  About 7% of shares voted against it.  *Id.*

[71] Compl. ¶ 20.

[72] *Id.* ¶ 75.

[73] *Id.* ¶ 76.

[74] *Id.*

[75] *Id.* ¶ 19; C.A. 2021-0268-MTZ, Dkt. 1, ¶ 19.

17

2021 and Franchi on April 9, 2021.[76] The cases were consolidated on April 14, 2021.[77]

The consolidated Complaint advances four counts. Counts I, II, and III are direct claims for breach of fiduciary duty against certain Churchill directors, officers, and its controlling stockholder, respectively.[78] The plaintiffs allege that the defendants, putting their own interests above Churchill Class A stockholders' interests, issued a false and misleading proxy that impaired Class A stockholders' informed exercise of their redemption and voting rights.[79] Count IV is an aiding and abetting claim against The Klein Group.[80]

The defendants moved to dismiss the Complaint on May 3, 2021.[81] Briefing on the motions was completed on September 10, 2021.[82] I heard oral argument on the motions on September 20, 2021.[83]

---

[76] Dkt. 1; C.A. 2021-0268-MTZ, Dkt. 1.

[77] C.A. 2021-0268-MTZ, Dkt. 15.

[78] Compl. ¶¶ 99-123.

[79] *Id.* ¶¶ 102-05, 109-11, 118-20.

[80] *Id.* ¶¶ 124-30.

[81] Dkts. 12, 13.

[82] *See* Dkt. 30.

[83] Dkts. 42, 43.

## II.    LEGAL ANALYSIS

The defendants have moved to dismiss the Complaint under Court of Chancery Rule 23.1 for failure to plead demand futility and under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted. When considering a motion to dismiss pursuant to Rule 12(b)(6):

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and [(iv)] dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[84]

These "pleading standards for purposes of a Rule 12(b)(6) motion 'are minimal,'" and the operative test is "one of 'reasonable conceivability,'" which asks "whether there is a 'possibility' of recovery."[85]

The Rule 12(b)(6) pleading standard necessarily informs my analysis of the plaintiffs' claims. Many of the defendants' arguments would require the court to weigh evidence or draw inferences in the defendants' favor. But I can do neither on

---

[84] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (quoting *Kofron v. Amoco Chems. Corp.*, 441 A.2d 226, 227 (Del. 1982)).

[85] *In re China Agritech, Inc. S'holder Deriv. Litig.*, 2013 WL 2181514, at *23-24 (Del. Ch. May 21, 2013) (quoting *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536-37 (Del. 2011)).

a motion to dismiss.[86] Rather than belabor these principles throughout this decision, it should be understood that the plaintiffs' well-pleaded factual allegations are credited in full and that the plaintiffs are receiving the benefit of all reasonable inferences.

The plaintiff-friendly pleading standard also bears upon my understanding of the plaintiffs' claims. As a general matter, the parties agree on the applicable standards of conduct. There is no dispute that Churchill's directors, officers, and controlling stockholder owed fiduciary duties of care and loyalty to stockholders. "[T]he duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."[87] The duty of disclosure is an "application of the fiduciary duties of care and loyalty" implicated when fiduciaries communicate with stockholders.[88] "[W]here there is reason to

---

[86] *See Savor*, 812 A.2d at 896 (noting that all inferences must be drawn in favor of the non-moving party); *Voigt v. Metcalf*, 2020 WL 614999, at *9 (Del. Ch. Feb. 10, 2020) ("The incorporation-by-reference doctrine does not enable a court to weigh evidence on a motion to dismiss. It permits a court to review the actual documents to ensure that the plaintiff has not misrepresented their contents and that any inference the plaintiff seeks to have drawn is a reasonable one.").

[87] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993).

[88] *Dohmen v. Goodman*, 234 A.3d 1161, 1168 (Del. 2020); *see Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992) (stating that "directors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action").

believe that the board lacked good faith in approving a disclosure, the violation implicates the duty of loyalty."[89]

But the parties disagree about whether those standards of conduct, as applied to the plaintiffs' allegations, give rise to severable claims or a holistic claim for breach of fiduciary duty. The Complaint alleges that the defendants breached their fiduciary duties by prioritizing their personal interests above the interests of Class A stockholders in pursuing the merger and by issuing a false and misleading proxy, harming stockholders who could not exercise their redemption rights on an informed basis.[90] The defendants aver that the plaintiffs' fiduciary duty claims should be viewed in four segments as (1) an overpayment claim, (2) a waste claim, (3) a redemption-related disclosure claim, and (4) a voting-related disclosure claim. They argue that the first two are subject to dismissal because they are derivative (or have been "abandoned" by the plaintiffs), leaving only narrow disclosure claims for adjudication.[91] The plaintiffs reject that characterization of their claims, asserting that the structure of the SPAC creates conflicts between the Sponsor and public

---

[89] *Pfeffer v. Redstone*, 965 A.2d 676, 690 (Del. 2009) (quoting *In re Tyson Foods, Inc.*, 919 A.2d 563, 597-98 (Del. Ch. 2007)).

[90] *See* Compl. ¶¶ 102-05, 109-11, 118-20.

[91] *See* Reply Br. in Supp. of MultiPlan Corporation's Mot. to Dismiss the Verified Class Action Compl. 3-6 (Dkt. 30).

stockholders and gives rise to a duty of loyalty claim that is inextricably intertwined with their allegations about false and misleading disclosures.[92]

The parties' diverging views about the fundamental nature of the plaintiffs' claims are undoubtedly driven by the distinctive features of a SPAC. But the Rule 12(b)(6) standard that I must apply and the principles of Delaware law that I consider while doing so are unchanged. Viewing the Complaint in the light most favorable to the plaintiffs, the crux of the plaintiffs' claims is that the defendants' actions—principally in the form of misstatements and omissions—impaired Churchill public stockholders' their redemption rights to the defendants' benefit.[93] In a value-decreasing merger, non-redemptions would be valuable to those holding founder shares. Because the public stockholders were allegedly not fully informed of all material information about MultiPlan, they exchanged their right to $10.04 per share—held in a trust for their benefit—for an interest in Public MultiPlan. This plaintiff-friendly construction of the Complaint underpins my analysis of the breach

---

[92] Pls.' Omnibus Answering Br. in Opp'n to Defs.' Mots. to Dismiss the Verified Class Action Compl. ("Pls.' Answering Br.") 42-43 (Dkt. 27); Compl. ¶¶ 100-05, 108-13, 117-22. The idea that the duty of loyalty is invoked by false and misleading disclosures informing stockholder action is nothing new. *See Pfeffer*, 965 A.2d at 690; Jack B. Jacobs, *The Fiduciary Duty of Disclosure after* Dabit, 2 J. Bus. & Tech. L. 391, 397 (2007) ("[T]he fiduciary duty of disclosure, in its formative years, was strongly rooted in the fiduciary duty of loyalty." (citing Lawrence A. Hamermesh, *Calling Off the Lynch Mob: The Corporate Director's Fiduciary Disclosure Duty*, 49 Vand. L. Rev. 1087 (1996))).

[93] *See* Compl. ¶¶ 102-05, 109-11, 118-20.

of fiduciary duty claims in Counts I through III and the aiding and abetting claim in Count IV.

This opinion proceeds in three parts. First, I address certain threshold issues: whether the plaintiffs' claims are direct or derivative, whether they are governed by contract, and whether they are "holder" claims. Second, I address the plaintiffs' breach of fiduciary duty claims, including the standard of review. Finally, I address the plaintiffs' aiding and abetting claim.

## A. Threshold Issues

The principal grounds for dismissal advanced by the defendants are that the Complaint pleads derivative claims without alleging demand futility and seeks relief that is duplicative of claims belonging to the Company. These arguments largely rest on the premise that the plaintiffs have alleged a core duty of loyalty claim based on the defendants' overpayment for MultiPlan that should be viewed as "exclusively derivative" under the *Tooley* analysis.[94] Even if the claims are found to be direct, the defendants maintain that dismissal is appropriate because the claims are governed by contract or are incognizable holder claims. I address each argument in turn.

---

[94] *El Paso Pipeline GP Co. v. Brinckerhoff*, 152 A.3d 1248, 1265 (Del. 2016); *see In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 768, 771-72 (Del. 2006).

### 1. Whether the Claims Are Direct or Derivative

The plaintiffs' claims are styled as direct claims asserted on behalf of a putative class of Churchill stockholders. The defendants contend that the plaintiffs' breach of fiduciary duty claims are quintessentially derivative and subject to Rule 23.1. Because the plaintiffs did not make a pre-suit demand or allege demand futility, the defendants argue that the Complaint must be dismissed.[95]

Resolving this issue requires the application of the test established in *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*[96] Two questions form that test: "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"[97] Under *Tooley*, the "[p]laintiffs' classification of the suit is not binding."[98] The court must "look to all the facts of the complaint and determine for itself" whether a claim is direct or derivative.[99]

---

[95] Public MultiPlan's initial fourteen-member board included only two former Churchill directors. Proxy at 169-72. The remaining directors were unaffiliated with Churchill. *Id.*

[96] 845 A.2d 1031 (Del. 2004).

[97] *Id.* at 1033.

[98] *Id.* at 1035 (quoting *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 2003 WL 203060, at *3 (Del. Ch. Jan. 21, 2003)).

[99] *Dieterich v. Harrer*, 857 A.2d 1017, 1027 (Del. Ch. 2004).

### a. Who Suffered the Alleged Harm?

To show a direct injury under *Tooley*, a plaintiff "must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation."[100] In other words, "[t]he stockholder's claimed direct injury must be independent of any alleged injury to the corporation."[101] Overpayment claims allege that corporate fiduciaries, in breaching their duties, caused an exchange of assets or equity at a loss to the corporation.[102] They are normally viewed as "exclusively derivative" under the *Tooley* analysis.[103] Any harm to stockholders from an overpayment is indirect in the form of dilution to the value of their stock.

But this is not a typical overpayment or dilution case. The Complaint centers around the allegation that the Board impaired the public stockholders' informed

---

[100] *Tooley*, 845 A.2d at 1039.

[101] *Id.*; *see Brookfield Asset Mgmt., Inc. v. Rosson*, 261 A.3d 1251, 1273 (Del. 2021) ("*Tooley*'s first prong instead properly focuses on who suffered the alleged harm and requires that the stockholder demonstrate that he or she has suffered an injury that is not dependent on an injury to the corporation.").

[102] *See In re TerraForm Power, Inc. S'holders Litig.*, 2020 WL 6375859, at *9 (Del. Ch. Oct. 30, 2020) ("[C]orporate overpayment is the quintessence of a claim belonging to an entity: that fiduciaries, acting in a way that breaches their duties, have caused the entity to exchange assets at a loss."); *see Brookfield Asset Mgmt.*, 261 A.3d at 1266-67.

[103] *El Paso Pipeline*, 152 A.3d at 1261; *see id.* at 1265 (explaining that a corporate overpayment claim concerns a harm to the entity because "the corporation's funds have been wrongfully depleted" (quoting *Protas v. Cavanagh*, 2012 WL 1580969, at *6 (Del. Ch. May 4, 2012))); *see In re J.P. Morgan Chase*, 906 A.2d at 768, 771-72.

exercise of their redemption right. Could this harm have run to the corporation? No. Churchill had no such redemption right and the public stockholders' funds held in trust did not belong to Churchill until those stockholders opted not to redeem but to invest in the post-merger combined entity. Therefore, the stockholders suffered a harm independent of and not shared with Churchill. Assuming the truth of the well-pleaded allegations in the Complaint and drawing all reasonable inferences in favor of the plaintiffs, the plaintiffs have brought a direct claim stemming from the defendants' interference with a personal right of stockholders.

The parties' arguments analogize the redemption right to stockholders' right to vote. Delaware courts regard "a wrongful impairment by fiduciaries of the stockholders' voting power or freedom" as causing "a personal injury to the stockholders, not the corporate entity."[104] The Complaint asserts that both the stockholder vote and redemption right—predicate steps to any initial business

---

[104] *In re Gaylord Container Corp. S'holders Litig.*, 747 A.2d 71, 79 (Del. Ch. 1999). In other contexts, the Court of Chancery has viewed claims to redress conduct infringing upon stockholders' personal rights as direct in nature. *See, e.g., Trenwich Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 212 (Del. Ch. 2006) ("[O]ur law has treated claims by stockholders that corporate disclosures in connection with a stockholder vote or tender were materially misleading as direct claims belonging to the stockholders who were asked to vote or tender."); *Williams Cos. S'holder Litig.*, 2021 WL 754593, at *20 (Del. Ch. Feb. 26, 2021) (finding claims concerning a rights plan that "infringe[d] on the stockholders' ability to communicate freely"—a "subsidiary" fundamental right—direct under *Tooley*), *aff'd*, 2021 WL 5112495 (Del. Nov. 3, 2021) (TABLE).

combination—were impaired.[105] But, given the mechanics of a SPAC, the latter arguably takes on greater importance to stockholders.[106] Redeeming public stockholders retained the right (indeed, were obligated) to vote on the merger, decoupling their voting and economic interests in the de-SPAC. They had no obvious incentive to vote a deal down. The warrants received with Churchill IPO units, which those stockholders would retain despite redeeming, would be worthless absent a deal. And, if a deal went through, redeeming stockholders would receive the value of their redemptions immediately.[107]

The defendants' alleged interference with that redemption right—and with the stockholder vote—took the form of purposefully and materially misleading disclosures.[108] For example, the Complaint states that the Proxy "fail[ed] to mention

---

[105] New York Stock Exchange rules mandate that stockholders be given the option to redeem if they vote "no" on an initial business combination. *See* Self-Regulatory Organizations; New York Stock Exchange LLC, Exchange Act Release No. 81099, 82 Fed. Reg. 13905 (Mar. 10, 2017). SPACs generally allow stockholders to redeem regardless of how they vote. *See* Rodrigues & Stegemoller, *supra* note 5, at 35.

[106] Rodrigues & Stegemoller, *supra* note 5, at 30-40 (arguing that the decoupling of voting and economic interests renders SPAC stockholder votes "empty" and "a mere fig leaf").

[107] Prospectus at 26; Proxy at 14. Of course, stockholders could separately sell their warrants.

[108] The fiduciary duty that was allegedly breached was "owed to the stockholder" as required by *Tooley*. 845 A.2d at 1039. In general, "the fiduciary relationship requires that the directors act prudently, loyally, and in good faith to maximize the value of the corporation over the long-term for the benefit of the providers of presumptively permanent equity capital, as warranted for an entity with a presumptively perpetual life in which the residual claimants have locked in their investment." *Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *18 (Del. Ch. Apr. 14, 2017). Fiduciary principles "do[] not protect special . . . rights." *Id.* at *22. The redemption right was not unique,

the imminent departure of UHC, MultiPlan's largest client, which provided 35% of its revenues in 2019" despite disclosing that Churchill management "communicate[d] with senior leaders of several large customers" during their "extensive diligence."[109] Class A stockholders therefore could not make "a fully informed decision [on] whether to redeem their shares ahead of the [m]erger."[110] As discussed below, it is reasonable to infer from those allegations that the defendants' disloyal conduct impaired stockholders' redemption rights, giving rise to individual claims.

> b. Who Would Receive the Benefit of Any Recovery or Other Remedy?

To maintain a direct claim, *Tooley* also requires that stockholders demonstrate that they will benefit from the remedy sought.[111] The plaintiffs seek, among other things, an award of money damages to the putative class and a return of capital raised from public stockholders.[112] They, rather than the Company, would receive the benefit of that recovery.

---

however, it was "a right shared equally with the common stock." *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 39-40 (Del. Ch. Aug. 16, 2013) ("*Trados II*").

[109] Compl. ¶ 84.

[110] *Id.* ¶ 83.

[111] *Tooley*, 845 A.2d at 1036 (noting that in "individual suits, the recovery or other relief flows directly to the stockholders, not to the corporation").

[112] Compl., Prayer for Relief ¶¶ G-K.

The defendants argue that the plaintiffs can only recover indirectly through a remedy to the corporation as a whole. In an overpayment case, the direct harm of dilution is "merely the unavoidable result" of the central derivative harm: "the reduction in value of the entire corporate entity, of which each share of equity represents an equal fraction."[113] "The recovery—'restoration of the improperly reduced value'—flows to the corporation."[114] The stockholders would share in any such recovery through their holdings in Public MultiPlan.[115]

Here, by contrast, Class A stockholders harmed through the impairment of their redemption rights personally lost the opportunity to recover $10.04 before the merger closed and any reduction in enterprise value occurred. Fully informed public stockholders could have exercised their redemption rights and received $10.04 per share rather than MultiPlan stock worth less.

The defendants insist that any monetary recovery would accrue to the Company, rather than to stockholders individually. They cite to *In re J.P. Morgan Chase & Company Shareholder Litigation*, where the Court of Chancery explained that compensatory damages must be "logically and reasonably related to the harm

---

[113] *Gentile v. Rossette*, 906 A.2d 91, 99 (Del. 2006).

[114] *El Paso Pipeline*, 152 A.3d at 1261 (quoting *Gentile*, 906 A.2d at 99).

[115] *See id.* at 1264 ("Were [the plaintiff] to recover directly for the alleged decrease in the value of the Partnership's assets, the damages would be proportionate to his ownership interest. The necessity of a *pro rata* recovery to remedy the alleged harm indicates that his claim is derivative.").

29

or injury for which compensation is being awarded."[116] In *J.P. Morgan*, the court found that the plaintiffs could not tie a disclosure claim to their demand for $7 billion of damages, which was "a logical and reasonable consequence (and measure) of the harm caused to [J.P. Morgan] for being caused to overpay for [the target]."[117] But the association between the monetary damages sought and the alleged harm suffered by Class A stockholders who lacked information needed to exercise their redemption rights is self-evident. That distinct purported injury can be assessed without considering any overpayment (or lack thereof) by Churchill.

In an overpayment claim, the Company would presumably seek recovery from the individual defendants and the Sponsor based on the difference between the implied value of Public MultiPlan, given what Churchill paid MultiPlan stockholders, and the true value of Public MultiPlan. The former value is irrelevant to the direct harm, however, which is based instead on the $10.04 per share redemption price.[118] That is, the option to make an informed redemption decision

---

[116] 906 A.2d at 773; *see* Defendant MultiPlan Corporation f/k/a Churchill Capital Corp. III's Mot. to Dismiss the Verified Compl. 26-30 (Dkt. 13) ("MultiPlan Br.").

[117] 906 A.2d at 773. The court also held that one could not "conflat[e] their individual direct claim of liability for a duty of disclosure violation with the compensatory damages flowing from the corporation's separate and distinct underlying derivative claim for waste." *Id.* Again, however, the plaintiffs' purported damages are separate.

[118] A simple, stylized example may best illustrate the point. Assume that four public investors each purchase one $10 unit in a SPAC IPO (consisting of one share and a fractional warrant) and have a redemption right worth $10 per share. A sponsor holds a founder share that will convert into a public share when the SPAC completes a merger. A business combination is announced, and the post-merger entity is valued at $60 despite its

30

had a value to stockholders independent of any injury to the Company. Damages for impairment of the redemption right flow to the stockholder—not Churchill.

The remedy for this direct harm does not implicate the type of double recovery concerns recently discussed by the Delaware Supreme Court in *Brookfield Asset Management, Inc. v. Rosson*.[119] There, the court explained that the "double recovery rule prohibits a plaintiff from recovering twice for the same injury from the same tortfeasor" and rejected the appellees' proposal that our law "devise a mechanism to 'proportion' the recovery for the overpaid funds between the plaintiffs if both derivative and direct shareholders claim it."[120] But, again, because the potential harm in this case is distinct and the recovery would flow directly to the public

---

"true" value being $30 because of issues that were omitted from the proxy statement. No public stockholders therefore choose to redeem because they expect to hold shares worth $12 after the business combination. The stockholders were harmed directly when the hypothetical directors breached their fiduciary duties by issuing false and misleading disclosures that prevented an informed exercise of redemption rights. The corporation was then harmed when the funds remaining in the trust were used to overpay for an asset. The derivative harm to the SPAC would be remedied by $10 of damages ($2 to each of the stockholders, including the holder of the founder share), which would result in each of the five stockholders seeing their post-merger share values increase from $6 per share to $8. But the direct harm from the impairment of the redemption right stems from a right to $10 being converted into a $6 share. That recovery totals $16 ($4 to each of the public stockholders). The separateness of the direct harm is even more apparent if the hypothetical target was truly worth $45. In that scenario, the corporation would not have an overpayment claim because it purchased something worth $45 for only $40. But the public stockholders could claim that they were prevented from exercising a $10 redemption right given that they were left with a share worth $9 instead.

[119] 261 A.3d at 1277.

[120] *Id.*

31

stockholders, the plaintiffs would not recover twice for the same injury if an overpayment claim was also pursued.

At bottom, the plaintiffs are not suing because Churchill did not combine with MultiPlan on more favorable terms. They are suing because the defendants, purportedly for self-serving purposes, induced Class A stockholders to forgo the opportunity to convert their Churchill shares into a guaranteed $10.04 per share in favor of investing in Public MultiPlan. That claim is direct.

### 2. Whether the Claims Are Governed by Contract

Even if the plaintiffs' claims are direct, the defendants assert that they must be dismissed because the redemption right is contractual. "It is a well-settled principle that where a dispute arises from obligations that are expressly addressed by contract . . . any fiduciary claims arising out of the same facts that underlie the contract obligations [will] be foreclosed as superfluous."[121] Plaintiffs cannot "'bootstrap' a breach of fiduciary duty claim into a breach of contract claim," and courts must dismiss such breach of fiduciary duty claims "where the two claims overlap completely."[122] Because I cannot conclude that the plaintiffs' fiduciary duty

---

[121] *Nemec v. Shrader*, 991 A.2d 1120, 1129 (Del. 2010).

[122] *Bäcker v. Palisades Growth Cap. II, L.P.*, 246 A.3d 81, 109 (Del. 2021) (quoting *Grunstein v. Silva*, 2009 WL 4698541, at *6 (Del. Ch. Dec. 8, 2009)); *see id.* ("[B]ootstrapping case law only requires dismissal where a fiduciary duty claim wholly overlaps with a concurrent breach of contract claim."). In *Bäcker*, the defendants argued that equitable relief in connection with an attempted board takeover was invalid because it constituted extracontractual relief. *Id.* at 108. The court held that while "[t]he subject

claims would be subsumed within a contractual claim, I decline to grant dismissal on that basis.

It is uncontested that Churchill's certificate of incorporation provides stockholders with the right to redeem.[123] Churchill's charter stated that "[p]rior to the consummation of the initial Business Combination, [Churchill] shall provide all holders of Offering Shares with the opportunity to have their Offering Shares redeemed upon the consummation of the initial Business Combination . . . for cash equal to the applicable redemption price per share."[124] But this dispute is not about whether Class A stockholders received that opportunity. Churchill *met* its contractual obligation and stockholders had the chance to redeem. Instead, the plaintiffs argue that the defendants disloyally impaired that right by breaching their duty to disclose.

The plaintiffs are not attempting to change the contours of their redemption rights beyond those defined by Churchill's charter. This case is therefore unlike those where Delaware courts have held that a fiduciary duty claim could not be

---

matter of the voting agreement . . . overlapped with the [defendants'] inequitable conduct . . . the court's equitable award addressed harm flowing from the [defendants'] deceptive conduct in their capacities as directors, not from a breach of contract in their capacities as stockholders and parties to the voting agreement." *Id.* at 109.

[123] "Certificates of incorporation are regarded as contracts between the shareholders and the corporation, and are judicially interpreted as such." *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012).

[124] Certificate of Incorporation § 9.2.

maintained because it sought to enforce obligations governed by contract. In *Nemec v. Shrader*, for example, the Delaware Supreme Court concluded that a claim involving a company redeeming retired employees' shares at book value before a transaction that would materially increase the value of the employees' stock was "expressly addressed by contract."[125] Because the right to redeem the retired stockholders' shares was covered by a stock plan and "not one that attached to or devolved upon all the Company's common shares generally, irrespective of a contract," the court declined to expand the contract rights using fiduciary duties.[126]

The plaintiffs' claims concern fiduciary duties owed in conjunction with a contractual right. They allege that key information, which would have informed the exercise of the right, was withheld or misrepresented.[127] Churchill's certificate of incorporation does not speak to whether the Board was obligated to disclose all

---

[125] 991 A.2d at 1124-25, 1128-29.

[126] *Id.* at 1128-29; *see also Gale v. Bershad*, 1998 WL 118022, at *5 (Del. Ch. Mar. 4, 1998) (determining that a claim challenging a company's redemption of preferred stock at an allegedly unfair value "ar[ose] out of the parties' contractual, as opposed to fiduciary, relationship"); *Madison Realty P'rs 7, LLC v. AG ISA, LLC*, 2001 WL 406268, at *6 (Del. Ch. Apr. 17, 2001) (dismissing fiduciary duty claims where the determination of whether capital contributions based on a partnership agreement could cease without contractually required notice was "expressly treated" by that agreement); *In re Gen. Motors Class H S'holders Litig.*, 734 A.2d 611, 619 (Del. Ch. Mar. 22, 1999) (noting that breaching a contractual provision for a particular class of stock was governed by contract and could not be asserted as a claim for breach of fiduciary duty).

[127] *See, e.g.*, Compl. ¶¶ 83-89.

material information about a proposed merger when stockholders were deciding whether to redeem.[128]

In *Malone v. Brincat*, the Delaware Supreme Court explained that "a board of directors is under a fiduciary duty to disclose material information when seeking shareholder action."[129] Here, the Board did not make a recommendation about how stockholders' rights to redeem should be exercised. But Class A stockholders were required nonetheless to decide whether to request that their cash be returned to them from the trust or to invest that cash in the proposed business combination.[130] They relied upon the Board to provide them with all material information in making that choice. This call for action was a stockholder "investment decision[]" like "purchasing and tendering stock or making an appraisal election," to which Delaware courts have applied the duty of disclosure.[131] It is precisely the type of

---

[128] *See ODN*, 2017 WL 1437308, at *24 ("[T]he fact that a corporation is bound by its valid contractual obligations does not mean that a board does not owe fiduciary duties when considering how to handles those contractual obligations . . . .").

[129] 722 A.2d 5, 9 (Del. 1998) (citing *Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 137-38 (Del. 1997)).

[130] Compl. ¶¶ 13, 44.

[131] *In re CBS S'holder Class Action & Deriv. Litig.*, 2021 WL 268779, at *23 (Del. Ch. Jan. 17, 2021) (quoting *Dohmen*, 234 A.3d at 1168); *see also In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 16-17 (Del. Ch. 2014) ("When directors submit to the stockholders a transaction . . . which requires a stockholder investment decision (such as tendering shares or making an appraisal action), the directors of a Delaware corporation are required to disclose fully and fairly all material information within the Board's control." (internal citation omitted)); *In re Wayport, Inc. Litig.*, 76 A.3d 296, 314 (Del. Ch. 2013)

collective action on which directors' obligations to engage in full and fair disclosure are premised.[132]  A fiduciary duty claim on that basis is not foreclosed simply because the source of the right being exercised is contractual.[133]

### 3.    Whether the Claims Are Holder Claims

The defendants' final threshold argument is that even direct redemption-related fiduciary duty claims must be dismissed because they are holder claims.[134]

---

(describing disclosures requiring "a stockholder investment decision" as a "request for stockholder action").

[132] *See Dohmen*, 234 A.3d at 1171 (discussing the "collective action problem when a large number of stockholders are considering a transaction and depend on directors to disclose material facts bearing on the decision"); *Latesco, L.P. v. Wayport, Inc.*, 2009 WL 2246793, at *6 (Del. Ch. July 24, 2009) (explaining that where stockholders are asked to take collective action, "it would be impractical, if not impossible, for each stockholder to ask and have answered by the corporation its own set of questions regarding the decision presented for consideration" and that "[i]n the absence of a fiduciary duty by the corporation and its directors to engage in full and fair disclosure, stockholders would thus be forced to make a decision in an information vacuum").  Unlike in *Latesco*, which discussed stockholder action in the context of an individual stockholder transaction involving certain corporate insiders, Churchill public stockholders could not "refuse" to redeem until they were satisfied that sufficient information had been presented to them. *See id.*  There were "thousands" of public stockholders who held Churchill Class A shares from the record date through closing.  Compl. ¶ 93.

[133] *See, e.g.*, *In re GGP, Inc. S'holder Litig.*, 2021 WL 2102326, at *11, *24-25 (Del. Ch. May 25, 2021) (considering breach of fiduciary duty claims in connection with a transaction approved by a stockholder vote); *Firefighters' Pension Sys. City Kansas City, Mo. Tr. v. Presidio, Inc.*, 251 A.3d 212, 254-55, 260-61 (Del. Ch. 2021) (same); *In re Orchard Enters.*, 88 A.3d at 16-17, 29-32 (addressing breach of fiduciary duty claims in the context of a transaction requiring stockholder approval).

[134] *See In re CBS*, 2021 WL 268779, at *21 ("[C]lass action treatment of holder claims is inappropriate under state law."); *Citigroup Inc. v. AHW Inv. P'ship*, 140 A.3d 1125, 1132 (Del. 2016) (noting that holder claims may not be brought as a class action); MultiPlan Br. 45-49.

A holder claim is "a cause of action by persons wrongfully induced to *hold* stock instead of selling it."[135] A "textbook" example is a claim alleging that "material omissions [in a proxy statement] deprived . . . public stockholders of the opportunity to decide before [a] [m]erger whether to sell or hold their shares."[136]

Holder claims are predicated on stockholder inaction.[137] Delaware law distinguishes between disclosures that require stockholder action and those that do not, with only the latter requiring proof of causation, reliance, and damages.[138] Because reliance is an individual question of law or fact that "will inevitably predominate over common questions among class members,"[139] Delaware courts have held that class action treatment of holder claims is inappropriate.[140]

The plaintiffs have not advanced a holder claim. This dispute is not about whether the alleged omissions induced Class A stockholders to hold on to their stock.

---

[135] *Citigroup*, 140 A.3d at 1132 (quoting *Small v. Fritz Cos., Inc.*, 65 P.3d 1255, 1256 (Cal. 2003) (emphasis in original)).

[136] *In re CBS*, 2021 WL 268779, at *20.

[137] *Id.* at *23 ("[A] holder claim is predicated on a stockholder's claim that she did not act at all."). Further, a primary concern regarding holder claims is that stockholders are not truly harmed by poor disclosures that induce them to hold because the stock price at which the holder could have sold is artificially inflated by the incorrect disclosures. *See* Edward T. McDermott, *Holder Claims—Potential Causes of Action in Delaware and Beyond?*, 41 Del. J. Corp. L. 933, 934 (2017). That issue is not present here, as the stockholders held a right to redeem their shares at $10 plus interest.

[138] *In re CBS*, 2021 WL 268779, at *23 ("Holder claims, at bottom, are grounded in common law fraud or negligent misrepresentation."); *see Citigroup*, 140 A.3d at 1132-38.

[139] *Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 474 (Del. 1992).

[140] *See In re CBS*, 2021 WL 268779, at *20.

Churchill's public stockholders were faced with two choices: whether to exercise their redemption right and whether approve the merger.[141] The former choice was a call for stockholder action in the form of an "investment decision," not unlike "purchasing and tendering stock or making an appraisal election."[142] And stockholders could only redeem if they voted (either for or against) the merger.[143]

The public stockholders' investment culminated thus: divest or invest in the post-merger entity, approve or disapprove the merger. This is an active and affirmative choice around which the SPAC structure revolved. The defendants cannot escape liability for fiduciary duty breaches in connection with that choice by charactering it as a passive holder decision.

---

[141] Compl. ¶¶ 44, 66; *see* Proxy at 28 ("At the special meeting, stockholders will be asked to consider and vote upon the business combination proposal . . . .").

[142] *In re CBS*, 2021 WL 268779, at *23 (quoting *Dohmen*, 234 A.3d at 1168).

[143] Proxy at 29. Because the plaintiffs are not pursuing a holder claim, I need not consider the open question of whether a holder claim is cognizable as an individual cause of action in Delaware. *See Citigroup*, 140 A.3d at 1134-37 (describing the "numerous policy and proof problems" inherent in holder claims); *In re CBS*, 2021 WL 268779, at *21 ("The question remains whether [an individual holder] claim is (or ought to be) cognizable in Delaware law. In my view of the law, it is not."). Here, Class A stockholders' reliance on the Proxy can be reasonably inferred from the fact that stockholders acted—by either redeeming or investing—following the disclosure. *See Dohmen*, 234 A.3d at 1168-69 ("[W]hen directors seek stockholder action, and the directors fail to disclose material facts bearing on the decision, a beneficiary need not demonstrate other elements of proof . . . ."); *Malone*, 722 A.2d at 12 ("An action for a breach of fiduciary duty arising out of disclosure violations in connection with a request for stockholder action does not include the elements of reliance, causation and actual quantifiable monetary damages.").

## B. The Breach of Fiduciary Duty Claims

I next address the applicable standard of review and the plaintiffs' claims for breach of fiduciary duty as pleaded against Churchill's directors, officers, and controlling stockholder.

### 1. The Standard of Review

"When determining whether [defendants] have breached their fiduciary duties, Delaware corporate law distinguishes between the standard of conduct and the standard of review."[144] The standard of conduct—addressed above—"describes what directors are expected to do and is defined by the context of the duties of loyalty and care."[145] "The standard of review is the test that a court applies when evaluating whether directors have met the standard of conduct."[146]

Delaware's default standard of review is the business judgment rule, which "is a presumption that in making a business decision, the board of directors 'acted on an informed basis, in good faith and in the honest belief that the action was taken in the best interests of the company.'"[147] The plaintiffs allege that the business judgment presumption has been rebutted, requiring the application of entire fairness,

---

[144] *Chen v. Howard-Anderson*, 87 A.3d 648, 666 (Del. Ch. 2014).

[145] *Trados II*, 73 A.3d at 35.

[146] *Id.* at 35-36.

[147] *Solomon v. Armstrong*, 747 A.2d 1098, 1111 (Del. Ch. 1999) (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)), *aff'd*, 746 A.2d 277 (Del. 2000) (TABLE).

Delaware's "most onerous standard of review."[148]   The plaintiffs point to two independent—and individually sufficient—reasons for why entire fairness applies. One, the de-SPAC merger, including the opportunity to redeem, was a conflicted controller transaction.  Two, a majority of the Churchill Board was conflicted either because the directors were self-interested or because they lack independence from Klein.  The plaintiffs have pleaded facts supporting a reasonable inference that entire fairness applies on both bases.

a.      The Conflicted Controller Allegations

The parties agree that Klein, through his control of the Sponsor, was Churchill's controlling stockholder.[149]  Entire fairness is not triggered by that fact alone.[150]  The plaintiffs must also adequately plead that the controlling stockholder engaged in a conflicted transaction.  Delaware courts place conflicted controller transactions implicating entire fairness into one of two categories: "where the

---

[148] *ODN*, 2017 WL 1437308, at *26.

[149] *See* Individual Defs.' & Klein Entities' Br. 4; Pls.' Answering Br. 31; Compl. ¶¶ 34, 58, 116.  The Complaint defines the "Controller Defendants" as Klein, M. Klein & Co., and the Sponsor.  Compl. ¶ 34.  For simplicity, and given his overarching control of the entities, this decision will refer to the controlling stockholder as Klein.  As previously noted, although the plaintiffs include M. Klein & Co. in that group, M. Klein Associates, Inc. is the Sponsor's managing member.  *See supra* note 7.

[150] *E.g.*, *IRA Tr. FBO Bobbie Ahmed v. Crane*, 2017 WL 7053964, at *6 (Del. Ch. Dec. 11, 2017, *revised* Jan. 26, 2018) (explaining that the presence of a controller, without more, does "not automatically subject [the controller's conduct] to entire fairness review"); *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *12 (Del. Ch. Oct. 24, 2014) ("Entire fairness is not triggered solely because a company has a controlling stockholder.").

controller stands on both sides" and "where the controller competes with the common stockholders for consideration."[151]

The first category is not relevant in this case. Klein did not stand on both sides of the merger, which was an arms-length transaction between two unaffiliated parties. In terms of the second category, a controller competes with common stockholders when the controller (1) "receives greater monetary consideration for its shares than the minority stockholders"; (2) "takes a different form of consideration than the minority stockholders"; or (3) receives "a 'unique benefit' by extracting 'something uniquely valuable to the controller, even if the controller nominally receives the same consideration as all other stockholders'" to the detriment of the minority.[152]

The defendants focus on the first two forms of competition though the plaintiffs' allegations concern the third. The defendants maintain that Klein did not compete with Churchill's public stockholders because he did not receive any greater or different consideration than other Churchill stockholders in the merger. The Class

---

[151] *In re Crimson Expl.*, 2014 WL 5449419, at *12.

[152] *IRA Tr.*, 2014 WL 5449419, at *6 (quoting *In re Crimson Expl.*, 2014 WL 5449419, at *13); *see In re Viacom Inc. S'holders Litig.*, 2020 WL 7711128, at *11 (Del. Ch. Dec. 29, 2020); *In re Synthes, Inc. S'holder Litig.*, 50 A.3d 1022, 1034 (Del. Ch. 2012) ("[T]he plaintiffs must plead that [the alleged controller] had a conflicting interest in the Merger in the sense that he derived a personal financial benefit 'to the exclusion of, and detriment to, the minority stockholders.'" (quoting *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971))).

B shares were converted, as part of the merger, into the same Class A shares held by public stockholders. In that regard, Klein participated in the business combination on the same terms as all other Churchill stockholders.[153] But, for purposes of deciding the motions to dismiss, I cannot overlook that the defendants' argument rests on the assumption that Churchill completed a business combination. The plaintiffs' claims, however, center around a misalignment of interests during a prior step in the de-SPAC transaction process.

The well-pleaded allegations in the Complaint highlight a benefit unique to Klein at the point when Class A stockholders held redemption rights backed by a trust that Class B stockholders could not access, and Klein (who controlled the Sponsor) had an economic interest in 70% of the Class B shares. Both the Class B shares and the Private Placement Warrants held by the Sponsor would be worthless if Churchill did not complete a deal.[154] As of the record date, the Private Placement

---

[153] Klein may have further aligned himself with Class A stockholders. The Proxy disclosed that an entity affiliated with Klein, Garden State Capital Partners LLC, invested into the de-SPAC through the PIPE. *See* Proxy at 31, 100-01 (stating that Garden State purchased 8,500,000 shares of Churchill Class A common stock at a 1% discount to the $10 price paid by non-PIPE investors). Neither party briefed this fact, which is outside the pleadings in any case and does not influence my decision on the motions to dismiss. Regardless, I cannot assume that Klein's interest in Garden State is such that the value of his founder shares post-merger would be negated by losses borne by Garden State in the event of a value-decreasing merger to the extent that he would prefer no deal.

[154] Compl. ¶¶ 30, 79. *See* Klausner, Ohlrogge, & Ruan, *supra* note 5, at 13 ("While a SPAC sponsor and board would prefer a good deal over a bad deal, they can do very well in a value-decreasing deal—and they would lose everything in a liquidation. The shareholders, however, are better off with a liquidation than a value-decreasing merger.").

42

Warrants were worth roughly $51 million and the founder shares were worth approximately $305 million, representing a 1,219,900% gain on the Sponsor's $25,000 investment.[155] These figures would have dropped to zero absent a deal.

Churchill's public stockholders, on the other hand, would have received $10.04 per share if Churchill had failed to consummate a merger and liquidated. Instead, those that did not redeem received Public MultiPlan shares that were allegedly worth less.[156]

In brief, the merger had a value—sufficient to eschew redemption—to common stockholders if shares of the post-merger entity were worth $10.04. For Klein, given the (non-)value of his stock and warrants if no business combination resulted, the merger was valuable well below $10.04. This is a special benefit to Klein.

It can also be reasonably inferred that Klein gained a unique benefit from the redemption offer itself—it brought him one step closer to consummating a transaction that allegedly benefitted him to the detriment of Class A stockholders. Further, in a value-decreasing deal where the post-merger entity is expected to be

---

[155] Proxy at 116; Compl. ¶¶ 9, 67. The plaintiffs' calculations overlook the effect of the lock-up and "unvestment" of Class B shares. But, as discussed below, Klein would receive significant financial upside even considering the effects of the Sponsor Agreement and Investor Rights Agreement.

[156] Certificate of Incorporation § 9.2(d); Proxy at 14, 29.

43

worth less than $10.04 per share, issuing a share at $10.04—the effective result of a stockholder choosing not to redeem a Churchill share—is value enhancing to the existing stockholders. It is also patently harmful to the ones giving up $10.04 for something less valuable. Because of his founder shares, Klein effectively competed with the public stockholders for the funds held in trust and would be incentivized to discourage redemptions if the deal was expected to be value decreasing, as the plaintiffs allege.

The defendants assert that the founder shares' lock-up and the "unvestment" of 45% of the founder shares undercut the plaintiffs' claim that Klein was interested or received a windfall from doing "any" deal.[157] Although the lock-up and "unvestment" lowered the value of the alleged windfall that the defendants received, I cannot conclude on a motion to dismiss that it would negate it. Klein held 20,710,281 founder shares. Even the vested 55% of those shares, if hypothetically valued at $5 and discounted back 18 months at an aggressive 20% per year, are worth more than $40 million dollars.

---

[157] The defendants state in their brief that "nearly 60%" of the Sponsor's shares would unvest upon the closing of the merger and only revest "if, at some time one year after the [Merger] but before five years . . . [Public MultiPlan's] Class A common stock exceeds $12.50 for any 40 trading days in a 60 consecutive day period." Individual Defs.' & Klein Entities' Br. 19-20. The actual number, however, appears to be about 45%. *See* Proxy at 100, I-5, I-16.

The defendants also argue that, because Churchill had 19 months left in its completion window to consummate a merger, Klein (and the directors) would have pursued other deals if they believed the MultiPlan merger would be value decreasing. But it is logical to expect that MultiPlan was identified as the best target given that Churchill pursued the merger in the first place. Time left in the completion window does not change the potential for misaligned incentives. MultiPlan could have been viewed as an attractive target for Class B stockholders even if the resulting post-merger entity proved less valuable for Class A stockholders than if Churchill had liquidated.

The defendants also advance an overarching equitable argument: that the plaintiffs should be estopped from challenging the same economic incentives that were disclosed to them before they invested in Churchill. For example, investors purchasing Churchill IPO units knew that the Sponsor was receiving founder shares, that those shares were purchased for $25,000, and that they would expire worthless in the absence of a business combination.[158] In *In re SmileDirectClub, Inc. Derivative Litigation*, the Court of Chancery held that because a prospectus disclosed specific insider transactions that would dilute public stockholders post-

---

[158] *See* Prospectus at 14-16.

IPO, the plaintiff was barred from suing "by reason of its knowledge of the alleged wrong when it purchased the stock."[159]

In this case, the structure of the SPAC—and Klein's incentives—were disclosed in the prospectus but the transaction at issue was not. Public stockholders who invested in Churchill agreed to give the Sponsor an opportunity to look for a target company with the understanding that they retained an option to make a redemption decision. They did not, however, agree that they did not require all material information when the time came to make that choice. The defendants' argument might be persuasive if it had been made about the Proxy and the plaintiffs had opted not to redeem despite adequate disclosures—but that is not the universe alleged in the Complaint.

The defendants further contend that the Sponsor's promote (in the form of founder shares) cannot trigger entire fairness because this "structural feature" would appear in "*any* de-SPAC transaction" and "was not unique to the [a]cquisition."[160] That this structure has been utilized by other SPACs does not cure it of conflicts.

---

[159] 2021 WL 2182827, at *12 (Del. Ch. May 28, 2021) (quoting *7547 P'rs v. Beck*, 1995 WL 106490, at *3 (Del. Ch. Feb. 24, 1995)).

[160] Individual Defs.' & Klein Entities' Br. 30.

Nor does the technical legality of the de-SPAC mechanics. Under Delaware law, "[c]orporate acts must be 'twice-tested'—once by the law and again in equity."[161]

The potential conflict between Klein and public stockholders resulting from their different incentives in a bad deal versus no deal is sufficient to pass the "reasonably conceivable" threshold. The allegation that Klein caused Churchill to retain The Klein Group as its financial advisor in connection with the merger and related financing for a $30.5 million payment bolsters that conclusion.[162] Entire fairness is therefore the applicable standard of review.

### b. The Conflicted Board Allegations

The standard of review can also change from business judgment to entire fairness when a complaint "allege[s] facts supporting a reasonable inference that there were not enough sufficiently informed, disinterested individuals who acted in good faith when taking the challenged actions to comprise a board majority."[163]

---

[161] *Sample v. Morgan*, 914 A.2d 647, 672 (Del. Ch. 2007); *see generally Schnell v. Chris-Craft Indus., Inc.*, 285 A.2d 437, 439 (Del. 1971) ("[I]nequitable action does not become permissible simply because it is legally possible."); *ODN*, 2017 WL 1437308, at *10 ("Delaware follows the 'twice tested' framework when evaluating challenges to corporate acts.").

[162] Compl. ¶¶ 31, 81; *see In re Delphi Fin. Gp. S'holder Litig.*, 2012 WL 729232, at *13 (finding that a controller's interests were not aligned with public stockholders where he had misaligned incentives including that he owned the financial advisory firm hired to advise the company). The defendants' argument that the fee was "routine" and did not "create inherent conflicts" would require the court to draw inferences in their favor. *See* Individual Defs.' & Klein Entities' Br. 34-35.

[163] *ODN*, 2017 WL 1437308, at *26.

Here, the plaintiffs allege that all of the Board members were self-interested in the Merger, not independent from Klein, or both.

### i.    Director self-interestedness

The plaintiffs assert that the director defendants, excluding Mark Klein, were interested in the merger because of their economic interests in the Sponsor.[164] Directors are self-interested in a transaction when they "expect to 'derive any [material] personal financial benefit from it in the sense of self-dealing.'"[165] If the majority of the Board "labors under actual conflicts of interest," entire fairness applies.[166]

As with Klein, the plaintiffs allege that the director defendants would benefit from virtually any merger—even one that was value diminishing for Class A stockholders—because a merger would convert their otherwise valueless interests in Class B shares into shares of Public MultiPlan. According to the Complaint, based on the $11.09 closing price of Churchill common stock as of the record date, the directors' (other than Mark Klein) interests in the Sponsor had an implied market value of: $3.3 million for each of Abson, Mills, and Eck; $8.7 million for McDermid,

---

[164] Compl. ¶¶ 6, 60; Pls.' Answering Br. 12; Proxy at 248.

[165] *Calesa Assocs., L.P. v. Am. Cap., Ltd.*, 2016 WL 770251, at *11 (Del. Ch. Feb. 29, 2016) (quoting *Orman v. Cullman*, 794 A.2d 5, 23 (Del. Ch. 2002)).

[166] *Trados II*, 73 A.3d 17 at 44.

and $43.6 million for August.[167]  As Chancellor Chandler aptly remarked in *Orman v. Cullman*, it would be "naïve to say, as a matter of law, that $3.3 million is immaterial."[168]

The defendants, again, maintain that the founder shares aligned the directors' interests with public stockholders with respect to maximizing Churchill's long-term value.  "Delaware courts recognize that stock ownership by decision-makers aligns those decision-makers' interests with stockholder interests; maximizing price."[169]  But, as discussed above, this argument ignores the diverging interests between insider Class B stockholders and public Class A stockholders lacking the benefit of full information when faced with the choice of a bad deal or liquidation.[170]

A hypothetical value-decreasing transaction illustrates the point.  The fewest number of founder shares indirectly held by a director defendant (excluding Mark Klein) was 294,985.[171]  If Public MultiPlan turned out to be worth just $5 per share, one applied a significant discount rate because of the Class B lock-up, and one

---

[167] Compl. ¶ 67; *but see supra* note 68.

[168] 794 A.2d at 31.

[169] *In re BioClinica, Inc. S'holder Litig.*, 2013 WL 5631233, at *5 (Del. Ch. Oct. 16, 2013).

[170] *See AP Servs., LLP v. Lobell*, 2015 WL 3858818, at *5 (N.Y. Sup. Ct. 2015) (holding that allegations that SPAC directors held stock and warrants that would be rendered worthless absent a de-SPAC merger were sufficient at the pleading stage to rebut the presumption of the business judgment).

[171] Compl. ¶ 67; Proxy at 248.

49

accounted for the Sponsor shares that unvested, the directors holding the fewest amount of founder shares would still hold shares worth over half a million dollars post-merger. In that scenario, Class A stockholders would be left with $5 per share rather than the $10.04 they would have received had Churchill liquidated (or had they been fully informed and chosen to redeem). A greater than half-million-dollar payout is presumptively material at the motion to dismiss stage. The defendants may "ultimately be correct . . . that it was not material" to the directors but, at this point, the court can reasonably infer that a majority of the directors were self-interested.[172]

ii.     Director independence

The plaintiffs also assert that a majority of the Board was conflicted because the directors were not independent from Klein.[173] A director "subject to the interested party's dominion or beholden to that interested party" lacks

---

[172] *Frank v. Elgamal*, 2012 WL 1096090, at *11 (Del. Ch. Mar. 30, 2012); *Voigt*, 2020 WL 614999, at *15 (noting that although "[s]pecific information about the wealth of particular individuals is not generally available," "the magnitude" of the compensation the director received was "sufficiently large to support an inference of materiality at the pleading stage").

[173] *See Trados II*, 73 A.3d at 44-45.

independence.[174]   If a majority of the board approving a transaction lacks independence, entire fairness is the applicable standard of review.[175]

Klein appointed each of the directors to the Board and retained the unilateral power to remove them.[176]  "[B]eing nominated or elected by a director who controls the outcome is insufficient by itself to reasonably doubt a director's independence because 'that is the usual way a person becomes a corporate director.'"[177]  For most of the Board members, their directorships at Churchill also carried with them significant financial upsides given that they were compensated with interests in the Sponsor.  As addressed above, it is reasonable to infer that those interests were material.  But the allegations in the Complaint do not end there.

The plaintiffs further allege that Abson, August, Mark Klein, McDermid, and Mills were all beholden to Klein because he had appointed them to serve as directors of other "Churchill" SPACs, providing them founders shares with the potential for more "multi-million-dollar payday[s]" like those discussed above.[178]  Other than

---

[174] *In re BGC P'rs, Inc.* 2019 WL 4745121, at *6 (Del. Ch. Sept. 30, 2019) (quoting *Marchand v. Barnhill*, 212 A.3d 805, 818 (Del. 2019)); *Orman*, 794 A.2d at 24 (noting that a lack of independence can be show by facts establishing "that the directors are 'beholden' to [the controller] or so under their influence that their discretion would be sterilized" (quoting *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993))).

[175] *See Trados II*, 73 A.3d at 43.

[176] Compl. ¶ 59.

[177] *McElrath v. Kalanick*, 224 A.3d 982, 995 (Del. 2020) (quoting *Aronson*, 473 A.2d at 816).

[178] Compl. ¶¶ 23-27, 60-61.

Abson, those individuals were on at least five other Churchill SPAC boards.[179] It is conceivable that those directors would "expect to be considered for directorships" in future Klein-sponsored SPACs and that the founder shares they would receive from those positions were material to them.[180]

The plaintiffs raise additional allegations to impugn the independence of Mark Klein and Eck. Mark Klein (managing member of M. Klein & Co.) is Klein's brother.[181] Eck is a managing director at M. Klein & Co., which Klein controls, where Eck has been employed since 2016.[182]

Taking those allegations as true, the directors each had a personal or employment relationship with or received lucrative business opportunities from Klein. "[O]ur law is not blind to the practical realities of serving as a director of a

---

[179] *Id.* ¶ 60.

[180] *Caspian Select Credit Master Fund Ltd. v. Gohl*, 2015 WL 5718592, at *6-7 (Del. Ch. Sept. 28, 2015) (discussing a controller's appointment of directors to various boards and inferring that the directors "expect to be considered for directorships . . . in the future").

[181] Compl. ¶ 25; *see Marchand*, 212 A.3d at 818 ("When it comes to life's more intimate relationships concerning friendship and family, our law cannot 'ignore the social nature of humans' or that they are motivated by things other than money, such as 'love, friendship, cand collegiality.'" (quoting *In re Oracle Corp. Deriv. Litig.*, 824 A.2d 917, 938 (Del. Ch. 2003))).

[182] Compl. ¶¶ 21, 28. *See, e.g.*, *Beam v. Stewart*, 833 A.2d 961, 977-78 (Del. Ch. 2003) (finding that a director had a "material interest in her own continued employment" and that the controller's ability to affect that employment raised doubts about the director's independence); *Del. Cty. Empls. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1022-24 (Del. 2015) (noting that a director's job as an executive at a subsidiary of a corporation over which the controller had "substantial influence, as the largest stockholder, director, and Chairman" required a pleading stage inference that the director was not independent).

corporation with a controlling stockholder,"[183] and "[a] director may be considered beholden to . . . another when the allegedly controlling entity has the unilateral power . . . to decide whether the challenged director continues to receive a benefit."[184] "Although the actual extent of these relationships is not altogether clear at this point in the litigation, the existence of these interests and relationships is enough to defeat a motion to dismiss."[185]

### 2. The Breach of Fiduciary Duty Claim Against the Directors

Count I of the Complaint alleges that the directors breached their fiduciary duties by "prioritizing their own personal, financial, and/or reputational interests and approving the Merger, which was unfair to public Class A stockholders" and by "issuing the false and misleading Proxy," which harmed the public stockholders who did "not exercis[e] their redemption rights."[186] As previously discussed, this claim invokes both the duty of loyalty and disclosure duties implicating director loyalty. The Complaint states a non-exculpated breach of fiduciary duty claim against each of the directors.

When entire fairness applies, the defendant fiduciaries have the burden "to demonstrate that the challenged act or transaction was entirely fair to the corporation

---

[183] *In re BGC*, 2019 WL 4745121, at *7.

[184] *Orman*, 794 A.2d at 25 n.50.

[185] *In re New Valley Corp.*, 2001 WL 50212, at *8 (Del. Ch. Jan. 11, 2001).

[186] Compl. ¶¶ 102-04.

and its stockholders."[187]  The two aspects of that test—fair price and fair dealing—"must be examined as a whole since the question is one of entire fairness."[188]  Fair price "relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock."[189]  Fair dealing "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained."[190]  Because the inquiry is fact intensive, "it is rare the court will dismiss a fiduciary duty claim on a Rule 12(b)(6) motion when entire fairness is the governing standard of review."[191]  This case is no exception.

Critically, I note that the plaintiffs' claims are viable not simply because of the nature of the transaction or resulting conflicts.  They are reasonably conceivable because the Complaint alleges that the director defendants failed, disloyally, to

---

[187] *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 52 (Del. 2006).

[188] *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983).

[189] *Id.*

[190] *Id.*

[191] *Tornetta v. Musk*, 250 A.3d 793, 812 (Del. Ch. 2019); *see Hamilton P'rs, L.P. v. Highland Cap. Mgmt., L.P.*, 2014 WL 1813340, at *12 (Del. Ch. May 7, 2014) ("The possibility that the entire fairness standard of review may apply tends to preclude the Court from granting a motion to dismiss under Rule 12(b)(6) . . . ."); *Orman*, 794 A.2d at 15 n.36 (Del. Ch. 2002) ("Th[e] conclusion [that entire fairness applies] normally will preclude dismissal of a complaint on a Rule 12(b)(6) motion to dismiss . . . .").

disclose information necessary for the plaintiffs to knowledgeably exercise their redemption rights. This conclusion does not address the validity of a hypothetical claim where the disclosure is adequate and the allegations rest solely on the premise that fiduciaries were necessarily interested given the SPAC's structure. The core, direct harm presented in this case concerns the impairment of stockholder redemption rights. If public stockholders, in possession of all material information about the target, had chosen to invest rather than redeem, one can imagine a different outcome.

The Complaint contains well-pleaded allegations that false and misleading disclosures impaired Class A stockholders' exercise of their option to redeem. Like disclosures in the context of a tender offer, Churchill's disclosures were "unilateral and not counterbalanced by opposing points of view," placing an even more exacting duty to disclose upon fiduciaries in possession of the information.[192] The Proxy did not disclose that MultiPlan's largest customer was UHC and that UHC was developing an in-house alternative to MultiPlan that would both eliminate its need for MultiPlan's services and compete with MultiPlan. Information is material "if there is a substantial likelihood that a reasonable shareholder would consider it

---

[192] *Eisenberg v. Chi. Milwaukee Corp.*, 537 A.2d 1051, 1057, 1059 (Del. Ch. 1987) (remarking that "[s]hareholders are entitled to be informed of information in the fiduciaries' possession that is material to the fairness of the price").

important in deciding how to vote"[193]—or, in this instance, in deciding whether to redeem—such that it would be viewed as "significantly alter[ing] the 'total mix' of information made available."[194] Based on the plaintiffs' allegations, it is reasonably conceivable that a Class A stockholder would have been substantially likely to find this information important when deciding whether to redeem her Churchill shares.

In *Weinberger v. UOP*, the Delaware Supreme Court explained that the entire fairness standard incorporates a requirement of compliance with the duty of disclosure into the fair dealing aspect of the test.[195] Given the allegations of the Complaint, it is reasonably conceivable that the defendants failed to meet this standard. Of course, discovery may determine whether the transaction was unfair with regard to the disclosures and perhaps in other ways. But for purposes of the motions to dismiss, the alleged disclosure violations sufficiently give rise to a lack of overall fairness.[196]

---

[193] *Morrison v. Berry*, 191 A.3d 268, 282 (Del. 2018) (quoting *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985)).

[194] *Id.* at 283.

[195] 457 A.2d at 710; *see Voigt*, 2020 WL 614999, at *24; *Rabkin v. Philip A. Hunt Chem. Corp.*, 498 A.2d 1099, 1104 (Del. 1985) ("[The] duty of fairness certainly incorporates the principle that a cash-out merger must be free of fraud or misrepresentation . . . .").

[196] The defendants raise various reasons why the court should give little weight to the allegations about UHC-related disclosures. For example, the defendants maintain that the November 11, 2020 report that highlighted these issues was "shown to be false," Individual Defs.' & Klein Entities' Br. 5-6, and that the firm who issued the report has been accused of market "deception," MultiPlan Br. 15-16. These arguments rely on documents beyond those I can consider on a motion to dismiss and would require the court to weigh evidence. *See In re New Valley*, 2001 WL 50212, at *6 (declining to consider documents "neither

56

### 3. The Breach of Fiduciary Duty Claim Against the Controlling Stockholder

Count III of the Complaint alleges that the "Controller Defendants" breached their fiduciary duties "by agreeing to and entering into the Merger without ensuring that it was entirely fair" to the public stockholders who were harmed by not exercising their redemption rights.[197] Given Klein's control of the Class B shares and his ties to the Board, it is reasonably conceivable that he "had the power to control, influence, and cause—and actually did control, influence, and cause—the Company to enter into the Merger."[198] This count states a claim against Klein for many of the same reasons that the plaintiffs have stated a claim against the directors. The role (if any) of Klein as a controlling stockholder in the alleged impairment of stockholders' redemption rights cannot be resolved at the pleading stage.

### 4. The Breach of Fiduciary Duty Claim Against the Officers

Count II of the Complaint is brought against Klein, in his capacity as an officer, and Taragin as Churchill's CFO. The Complaint alleges that the "Officer Defendants" breached their fiduciary duties by "prioritizing their own personal,

---

integral to, nor effectively incorporated into, the plaintiffs' complaint" despite the defendants claiming "errors in plaintiffs' interpretation and mischaracterization" of the documents). Parties "cannot try the issue of fairness on a dismissal motion." *Shandler v. DLJ Merch. Banking, Inc.*, 2010 WL 2929654, at *12 n.108 (Del. Ch. July 26, 2010); *see In re New Valley*, 2001 WL 50212, at *7 (declining to conduct an entire fairness analysis where the plaintiffs had "alleged facts sufficient to plead an entire fairness claim").

[197] Compl. ¶ 120.

[198] *Id.* ¶ 118.

financial, and/or reputational interests and approving the Merger, which was unfair to public Churchill Class A stockholders."[199]  In addition, they "breached their duty of candor by issuing the false and misleading Proxy, as well as making false and misleading statements during [an] August 18, 2020 analyst day presentation."[200]

The Complaint is replete with allegations regarding Klein—although the capacity in which he was acting is unspecified.  Taragin presents a different matter.  The plaintiffs describe Taragin's role and his ties to other Klein affiliated entities.[201]  But they do not make a single allegation about actions that could expose him to liability.  Taragin's title as CFO of multiple Klein-backed entities does not absolve the plaintiffs of having to plead facts sufficient to raise doubt as to whether Taragin fulfilled his fiduciary duties.  He is therefore dismissed from this action.

### C.    The Aiding & Abetting Claim

Finally, the plaintiffs allege, in Count IV, that The Klein Group aided and abetted breaches of fiduciary duty.[202]  For the claim to proceed, the Complaint must allege facts that demonstrate four elements: "'(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, . . . (3) knowing participation in that breach by the defendants,' and (4) damages proximately caused by the

---

[199] *Id.* ¶ 110.

[200] *Id.* ¶ 111.

[201] *See id.* ¶¶ 22, 54.

[202] *Id.* ¶¶ 124-30.

breach."[203] As discussed above, the Complaint pleads facts sufficient to meet the first, second, and fourth elements. That leaves the third element, "knowing participation," to be considered.

"Knowing participation . . . requires that the third party act with the knowledge that the conduct advocated or assisted constitutes . . . a breach."[204] The plaintiffs allege that The Klein Group "knew that [the MultiPlan valuation analyses] were materially misleading, and that the Director Defendants and the Controller Defendants stood to profit immensely from the consummation of the Merger . . . even if the Merger was unfair to public Class A stockholders."[205]

At this stage in the case, Klein's knowledge on these matters can be imputed to The Klein Group.[206] In *Louisiana Municipal Police Employees' Retirement System v. Fertitta,* the court remarked that "[i]t would elevate form too far over substance to suggest, in the procedural posture of a Rule 12(b)(6) motion, that it is not a reasonable inference that facts known to [the controller] were also known to [controlled entities]."[207] The Klein Group is not just a "corporate shell[], created for

---

[203] *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001) (quoting *Penn Mart Realty Co. v. Becker*, 298 A.2d 349, 351 (Del Ch. 1972)).

[204] *Id.* at 1097.

[205] Compl. ¶ 127.

[206] Klein controls and is the managing partner of M. Klein & Co., The Klein Group's parent. *See id.* ¶¶ 21, 31.

[207] 2009 WL 2263406, at *7 n.27 (Del. Ch. July 28, 2009).

no other purpose than to facilitate related transactions of the fiduciary," as was the case in *Fertitta*.[208] That distinction does not, however, change the important parallel that The Klein Group is an entity controlled by Klein, who the plaintiffs allege understood and benefitted from conflicts inherent in the SPAC. It is reasonably conceivable that The Klein Group "participated in the board's decision[] . . . or otherwise caused the board to make the decision[] at issue": approve the merger while withholding material information from stockholders.

The defendants contend that knowing participation cannot be established because there are no allegations in the Complaint that The Klein Group "actively concealed information [from the Board] to which it knew the Board lacked access, or promoted the failure of a required disclosure by the Board."[209] But unlike the precedent the defendants rely on, The Klein Group was not an independent third-party advisor. It was an entity controlled by Churchill's controlling stockholder to (allegedly) provide a "patina of financial analysis."[210] The motions to dismiss are therefore denied with regard to the aiding and abetting claim.

---

[208] *Id.*

[209] *Houseman v. Sagerman*, 2014 WL 1600724, at *9 (Del. Ch. April. 16, 2014).

[210] Mot. to Dismiss Hr'g Tr. Sept. 20, 2021, at 97 (Dkt. 43).

## III.  CONCLUSION

For the reasons discussed above, the motions to dismiss are denied except as to Taragin in Count II.  Additionally, MultiPlan Corporation is dismissed as a party to this action.[211]

---

[211] The plaintiffs did not name Public MultiPlan as a party in any count to the Complaint. This is not a derivative action where the entity would typically be listed as a nominal defendant.  To the extent that the company must be named for remedial purposes at a later stage of the case, as the plaintiffs asserted at oral argument, they may move to add it as a party at that time.  *See, e.g.*, *Chester Cty. Ret. Sys. v. Collins*, 2016 WL 7117924, at *3 (Del. Ch. Dec. 6, 2016) (granting motion to dismiss where "[a]lthough the plaintiff named the Company as a defendant, it did not assert any claims against the Company"), *aff'd*, 165 A.3d 286 (Del. 2017) (TABLE).